AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

APPLE IPHONE 8+, RED IN COLOR, CURRENTLY
LOCATED AT 170 N. High St. Suite 206, Columbus, OH
43215

)
)
)
)
)
)

Case No. 2:20-mj-522

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1201(c) and (d) | Conspiracy to Commit and Attempted Kidnapping |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Jeremy Copeland, TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ *(specify reliable electronic means).*

Date:  7/28/20 @ 2:19 pm.

City and state:  Columbus, Ohio

_____
*Judge's signature*

**Chelsey M. Vascura, U.S. Magistrate Judge**
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** APPLE IPHONE 8+, RED IN COLOR, CURRENTLY LOCATED AT 170 NORTH HIGH STREET, SUITE 206, COLUMBUS, OHIO | **Case No.** _____ |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH

I, Jeremy Copeland, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I have been a law enforcement agent of the Department of Homeland Security, United States Customs and Border Protection, United States Border Patrol since June of 2008. I has over 12 years of total law enforcement training and experience to include, but not limited to, the detection and apprehension of undocumented foreign nationals, the detection and investigation of the sale/use of fraudulent documents and the apprehension of fraudulent document users (imposters), and the detection and arrest of narcotics and human smugglers/traffickers and other criminal individuals. I have been trained in the laws of search and seizure at the United States Border Patrol Academy in Artesia, New Mexico and have

received subsequent training in the utilization, preparation, and execution of search and seizure warrants as a member of a Sector Intelligence Unit.

3.     I have over five years specialized experience as a member of a Sector Intelligence Unit, for the purposes of conducting intelligence driven operations, collection, and investigations. I have interviewed, witnessed the interview of, and participated in the debriefing of numerous illegal aliens and criminals. Through this experience, I have gained in depth knowledge concerning the trade of fraudulent documents and smuggling techniques. I have investigated both criminal and administrative violations of law pertaining to immigration, identity theft, and other federal crimes.

4.     I am currently assigned to the Department of Homeland Security - Homeland Security Investigations Office, Columbus, as a Task Force Agent. As such, I am directly involved in and supported all aspects of criminal investigation to include interviewing subjects, gathering facts, correlating information, and building criminal cases for prosecution in the Southern District of Ohio.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.     The property to be searched is an Apple iPhone 8+, red in color, seized on the person of Ellis Latrent RAY, II at the time of his arrest, hereinafter the "Device." The Device is currently located at 170 North High Street, Suite 206, Columbus, Ohio.

7.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### *Case Initiation*

8.     On November 25, 2019, at approximately 5:26 a.m., in the area of the 4400 block of English Lavender Place an attempted kidnapping of two individuals occurred. VICTIM 1 and VICTIM 2 (VICTIM 1's girlfriend) had just entered VICTIM 1's vehicle. As VICTIM 1 fastened his seat belt with the driver's door still ajar, two males wearing all black with black face masks approached from the rear of the vehicle.  One of the men then used a Taser on VICTIM 1's neck and attempted to remove him from his vehicle. VICTIM 2 observed the incident from the passenger seat and began to scream, which caused the male to pause use of the Taser. At that point, VICTIM 1 was able to push the attacker back, and the two males fled on foot. VICTIM 1 stated he believed the suspects were trying to kidnap him and VICTIM 2, and steal the truck.

9.     On December 4, 2019, at approximately 5:27 a.m., Hilliard Police Officers were dispatched to the 4400 block of English Lavender Place for a second attempted kidnapping of VICTIM 1 and VICTIM 2. The caller, later identified as VICTIM 1, stated his girlfriend, VICTIM 2, got into his Chevy Silverado truck to go to work. VICTIM 1 left in a different vehicle. Before VICTIM 2 could pull the truck out of the parking spot to go to work, she was blocked in by a black Mercedes Benz in her parking spot. VICTIM 2 stated two males then confronted her wearing black jackets that said "Police" in the form of a patch on the jackets. The men had a photograph of VICTIM 1 and were yelling at VICTIM 2, "Police, open the door." The

males were pulling on the car door handle in an attempt to open the car door. VICTIM 1 noticed

the altercation after VICTIM 2 began honking the vehicle horn. VICTIM 2 was blocked in by the

Mercedes, and fearing for her safety, she drove her vehicle over the curb, across a patch of grass,

and fled the area. The men followed her to the area of Anson Dr. and Leap Rd. VICTIM 2 turned

down Anson Dr. and the suspects continued on Leap Rd. VICTIM 2 stated she did not believe

they were police because she saw no badges, guns/duty belts. The males were also wearing

tennis shoes and driving a Mercedes Benz.

### *Identifying the Co-conspirators*

10.    On December 4, 2019, Officers spoke with VICTIM 1 and VICTIM 2. VICTIM 2

advised that she was scared for her life as this was the second time people had tried to kidnap

her. VICTIM 2 believed VICTIM 1's ex-girlfriend was responsible for the incidents. VICTIM 1

admitted his ex-girlfriend, Denia Idelca AVILA, had planned to kidnap them, and he had two

videos, dated November 22, 2019, showing AVILA discussing it. The videos were provided to

officers. Police watched the videos, which showed AVILA and an unknown female, later

identified as Jessica WISE, discussing that AVILA was upset with VICTIM 1. AVILA stated in

the video; "We're doing this. I laid in the hospital for four days. He didn't answer the phone. She

wouldn't let him. He owes me. He's coming here..." "I had it ready to do it today, her pictures

right here, I was going to tell him this is why you are here mother fucker, she's the reason..."

11.    As the women continued to discuss their plans, a Taser is heard being sparked in

the background.  They discuss the effectiveness of a Taser on VICTIM 1, to include using

someone taller to Taser him, and AVILA talks about what type of clothing VICTIM 1 wears to

work. The women also discussed using Mace and how VICTIM 1 won't be able to see anything.

At one point the camera flips around and you can see AVILA and WISE. AVILA is also seen holding a pair of leg shackles in the video and states we need to get a gun. They talked about how to keep him (VICTIM 1) in the hotel room, discussed whether the door can be locked from the outside, and mentioned tying him to the bed with rope.

12.     WISE asked AVILA "you don't think he'll willingly stay?" AVILA responded "not if I do that, here's the thing..." WISE interrupted and stated "he's afraid you're gonna kill him?" AVILA answered "he's afraid because of the kids, because of the kids...everyone knows, you don't fuck with my kids...Now he knows all bets are off, you're dead, she's dead, everybody's dead." AVILA continued to cycle the leg shackles in her hands, clicking them open and closed several times during this portion of the conversation.

13.     AVILA advised she could buy ski masks for $1.99 at Walmart and she had already bought black gloves. The two women also planned what to do with VICTIM 1's vehicle, and where they could put it without it being seen by the cameras. AVILA further stated VICTIM 1 and VICTIM 2 would not call the police because VICTIM 1 would just be deported to Mexico. AVILA talked about being loyal to VICTIM 1, and discussed paying $7,000 to bring him back illegally after he was previously deported from the United States. At one point in the video, WISE mentions she knows a guy named "Michael" that would do this.

14.     VICTIM 1 confirmed that AVILA joined him in Mexico after he was deported in December of 2014. In January of 2015, VICTIM 1 stated that AVILA arranged for VICTIM 1 to be smuggled into the United States at the border, at which point AVILA met him, paid the smuggler and the two (AVILA and VICTIM 1) drove back to Ohio together. AVILA, therefore, knew that VICTIM 1 was in the United States illegally.

5

15.     On the second video, AVILA is seen and heard talking on the phone with a female determined to be WISE. AVILA stated VICTIM 1 was definitely getting "scooped" up, and talked about doing it on a Monday. The first kidnapping incident happened on Monday, November 25, 2019 in Hilliard, where VICTIM 1 was Tasered. AVILA also stated VICTIM 2 went too far when she talked to her (AVILA's) kids. AVILA stated that VICTIM 2 can only speak Spanish and has to be dealt with. AVILA said "you gotta figure out what I can do, like what would be ideal."

16.     AVILA discussed with WISE how to follow VICTIM 2 and injure her, beat her up, kidnap her. They also discussed doing this in an area without cameras, and possibly putting a GPS tracker on VICTIM 2's car.

17.     AVILA then discussed having VICTIM 2 taken to a remote location where she can have someone beat her up, drop her off, take her phone and other possessions, and leave her there. AVILA said "follow her (VICTIM 2), bop her, drop her off like really far, like where could we leave her...in the middle of nowhere, like I didn't even have cell phone service out there, but my best friends brother owns a...out there."

18.     AVILA discussed how she could be involved if she wore a mask, and how she could leave her phone in Atlanta to create an alibi. AVILA also mentioned how she could send her phone to a friend in Boston so her friend could make calls and take pictures acting like AVILA is not in Ohio.

19.     An arrest warrant was issued by Franklin County Municipal Court for AVILA on December 4, 2019 for Conspiracy to Commit Abduction.

6

20.	On December 5, 2019, AVILA was arrested at her place of employment located at 5235 Westpoint Dr. Groveport, Ohio 43135. Officers obtained consent to search AVILA's office and several Apple iPhones were seized as evidence. AVILA later admitted to owning the white Apple iPhone, but did not provide the passcode to the device. The second Apple iPhone, inside a grey case, was identified as AVILA's work phone which is owned by her employer, Inergroup. Officers were given consent to search AVILA's office and a key card was located in her jacket. Officers also located a dark grey Mercedes Benz sedan, which AVILA had driven to work. The Mercedes Benz matched the description of the vehicle used in the attempted kidnapping on December 4, 2019. Additional search warrants were obtained for the Mercedes Benz and contents of AVILA's purse. Inside the purse, officers located multiple IDs with AVILA's picture and various different names.

21.	During the initial meeting with the VICTIMs, VICTIM 1 stated that AVILA's mother warned him about her behavior and that AVILA had been staying at different hotels on the east side of Columbus. Using law enforcement databases, officers were able find that AVILA had stayed at 4105 Hamilton Square Blvd, Groveport, OH 43125, and room 108 of the WoodSpring Suites - Columbus Southeast on November 28, 2019. Officers spoke with employees at the hotel and verified that AVILA had paid for the room until December 5, 2019. Officers spoke with staff at this hotel, who verified that she has been seen coming and going from room 108.

22.	A search warrant was obtained for the hotel room on December 5, 2019. When officers executed the warrant, they located shirts with "police" on them, U.S. Immigration patches, handcuffs, black ski masks, black gloves, as well as an airsoft gun and holster. There

7

was also a MacBook Air laptop in the hotel room next to the television. The computer screen bears the name "Denia AVILA" when opened. Officers located documents, all in AVILA's name, such as an Ohio State ID, tax paperwork and birth certificates. Additionally, officers located photographs of both VICTIMS.

23.     A search warrant was obtained for AVILA's AT&T work cell phone on December 9, 2019. There were several conversations through text messages with "Mike 2" 614-439-9302 and "Mike" 614-284-0650. Through investigation it was discovered that "Mike 2" and "Mike" are Michael OUSLEY who also was employed at Pier 1 Imports, with the assistance of AVILA. AVILA also did a search for "Michael OUSLEY" in her google searches. It was discovered that both of these cell phones belong to OUSLEY.

24.     On December 10, 2019, officers went to the Pier 1 distribution center located at 5235 Westpointe Dr. Groveport, Ohio to speak with OUSLEY. OUSLEY told them that his friend, Jessica WISE, told him that she had a friend, AVILA, who could get him a job at the Pier 1 warehouse.

25.     OUSLEY also admitted to trying on police shirts and looking out for VICTIM 1's truck when he was at work. He further admitted to knowing AVILA. OUSLEY stated his "Mike 2" cell phone was located in AVILA's Porsche Cayenne, which he admitted to driving around and doing surveillance with her to watch VICTIM 1. He provided his cell phone, with number 614-284-0650, to officers. OUSLEY agreed to speak with officers on December 11, 2019. "Mike 2" had text messages from AVILA to have OUSLEY do surveillance on VICTIM 1 at his employer, which is in close proximity to Pier 1 Imports warehouse. Other texts from AVILA to "Mike2" requested that OUSLEY check "his" work because he is driving an unknown vehicle.

8

When they returned from the interview, Officers confirmed that the female in the Nest video was WISE.

26.     On December 11, 2019, OUSLEY came to the Hilliard Police Department and consented to the download of his cell phone with number 614-284-0650. OUSLEY's download also showed his contact number for WISE as 614-749-5439.

27.     OUSLEY's phone records show one communication between himself and WISE on November 24, 2019 stating "you still down for the a.m.? Denia wants your number. She is paying for your help BTW. Ok, can I give her your number?" OUSLEY responds with an image of a thumbs up.  OUSLEY cell phone location data does place him in the area of the first kidnapping attempt on November 25, 2019, which was the next day and the VICTIMS residence, around 7:30 a.m., which was after the attempt was completed.

28.     Officers drove OUSLEY around Hilliard and he specifically pointed out a warehouse across from the kidnapping site where he told officers he had sat and conducted surveillance on VICTIM 1 and VICTIM 2. OUSLEY maintained that he only "entertained" the idea of the kidnapping for AVILA, but he did not actively participate in the kidnapping.

29.     Cell phone location data corroborates OUSLEY's statements that he conducted surveillance on the VICTIMS.  For example, between November 1, 2019 and November 24, 2019, the cell phone associated with "Mike" was not in the area of the VICTIMS' residence. However, there is location data for that same device near the VICTIMS' residence on November 25-27, 2019, November 30, 2019 and December 2-4, 2019.

9

30.     Additionally, cell phone interaction between AVILA and OUSLEY appears to have begun on November 25, 2019 and ended December 5, 2019.

31.     When officers returned to the Police Department, they went through cell phone records obtained from AT&T. On November 22, 2019 at 9:41 p.m., a ninety minute phone call between 614-735-6560, which is AVILA's personal cell phone, is connected with 614-749-5439. This phone number belongs to WISE. The time of the phone call from AT&T records matches the second Nest video time.

32.     Phone call logs for "Mike2" (OUSLEY) show phone calls with AVILA's phone before and after the kidnapping attempt on December 4, 2019. The 614-284-0650 cell phone is the phone that OUSLEY admits to having with him at all times. He also stated he had this phone with him when he and AVILA went to the Surplus store to purchase police items believed to have been used in the attempted kidnappings.

33.     In fact, officers located a receipt to Surplus World Inc. in Columbus, Ohio dated November 29, 2019, several days after the first kidnapping attempt, during the search of AVILA's hotel room.  The receipt documented the purchase of two utility belts, a set of two "Police," which are believed to be patches, as well as two U.S. Immigration patches. Surveillance video from Surplus World, Inc. also confirmed that AVILA was present on November 29, 2019 for these purchases.  OUSLEY also stated that AVILA bought some "police stuff" and "ICE stuff" from the Surplus store that AVILA made him try on, including a shirt and ICE hat.

10

34.     Information from OUSLEY's cell phone show calls and text messages between he and AVILA. OUSLEY is also on video surveillance on November 30, 2019 at the hotel room where the search warrant was executed and the kidnapping related items were located.

35.     WISE was arrested on local charges on December 13, 2019 for involvement in the planning of the kidnapping. WISE consented to have her cell phone downloaded while she was interviewed by police. Her cell phone, AVILA's cell phones and OUSLEY's cell phones were sent to the Ohio State Highway Patrol Fusion Center. The Fusion Center analyst provided information linking one new potential suspect, Jerry MCCALLISTER JR.

36.     Phone records from OUSLEY to MCCALLISTER on December 4, 2019 show they communicated over text message from 4:05 a.m. until 4:26 a.m. Records also show a text message conversation from 7:21 a.m. until 7:48 a.m. where OUSLEY said to MCCALLISTER "you good dawg, man this chick got me stressed calling about some damn cheap ass taser man look when I took that vest off I threw it in right but I think I sat that shit on top of car before I got my big ass in back in cause aint no other explanation. Really don't know unless I dropped that shit again. Man that was fucked up this morning I'm still salty. Make sure you use your head nigga and be safe we don't need no probs. Damn mofo you aint answering."

37.     On March 26, 2020, the Ohio State Highway Patrol Fusion Center found 96 communications between OUSLEY and MCCALLISTER between December 2, 2019 and December 5, 2019. Specifically, there were 27 contacts between those two numbers on December 4, 2019 between the hours of 4:44 a.m. and 9:23 a.m., which covered the period of the second kidnapping attempt. Of significance, there were no communications between these two individuals from November 1, 2019 through December 1, 2019.

11

38.     Pursuant to a search warrant, Hilliard Police also received the cell phone location data back on April 24, 2020 for MCCALLISTER's cell phone. This was then given to the Fusion Center analyst. The analyst uploaded the information into their program and advised that on December 4, 2019, MCCALLISTER's cell phone did not receive any call between 5:03 a.m. and 6:27a.m.; of note, the second kidnapping attempt took place during this time period. The data showed, however, that MCCALLISTER received seven phone calls from OUSLEY between the hours of 4:43 a.m. and 4:49 a.m. that same morning. For these phone calls, MCCALLISTER''s phone plotted in the area of Wedgewood, which is the area of MCCALLISTER's last known residential address. Between 5:02 a.m. and 5:03 a.m. his cell phone travels north toward the VICTIMS' location, and receives one incoming call from OUSLEY at 5:03 a.m. Again, there was no cell phone activity between the hours of 5:03 a.m. and 6:27 a.m., but later MCCALLISTER's phone plotted on the east side of Columbus, away from the VICTIM's location and receives one incoming from call from OUSLEY at 6:27 a.m. Between the hours of 6:50 a.m. and 7:00 a.m. MCCALLISTER's phone then plots back in the area of Wedgewood and his last known residential address. Cell phone records show six calls with AVILA on December 4, 2019 after the attempted kidnapping.

39.     Although VICTIM 2 did not recognize a photograph of either OUSELY or MCCALLISTER, she did recognize the police patch on a black jacket found in AVILA's hotel room. She did not recall seeing the U.S. Immigration patch.

40.     A review of AVILA's work phone also revealed a screenshot of how ICE (Immigration and Customs Enforcement) makes arrests. Tagged internet searches on her work phone also included "The Hilliard Police," "army surplus stores," "ice costume," "ICE Federal

12

Agent Halloween Costume," "ice coat," "ice costume," "Immigration costume," "immigration officer uniform," "immigration officer jacket," "ice immigration," "cousins army navy and surplus store," "army surplus store," "police lights for sale," as well as searches for emergency lights, plate carries, and bulletproof vests.

### *RAY and the Device*

41.     The Fusion Center also showed cell phone 614-288-9970 (Device), which Sprint/Boost records revealed belonged to Ellis Latrent RAY II, in the area of 4422 English Lavender between the hours of 5:18 a.m. and 5:20 a.m. on November 25, 2019, during the time of the first kidnapping attempt. RAY II, who lives in Canal Winchester and is believed to work in Etna, does not appear to have a reason to be in the area of the VICTIMS' residence at that time of morning. In WISE's cell phone download this number is listed as "My Son." Additional text messages in WISE's phone indicated that RAY II is directly related to WISE.

42.     AVILA's work cell phone records also show a conversation with an individual she identified as "Fatboy" in her phone, who used phone number 614-228-9970, the Device (RAY II). "Fatboy" said "idk he the one that fucked it up too." AVILA responded "RIGHT!!" This conversation took place on December 1, 2019 at 7:51 a.m., one week after the initial kidnapping attempt. Further review of call activity between RAY II and AVILA showed approximately 17 interactions between November 24, 2019 – just one day before the first kidnapping attempt – and December 3, 2019 – one day before the second kidnapping attempt. Prior to November 24, 2019 and after December 3, 2019, there are no interactions.

13

43.     The Fusion Center provided a phone number of 614-404-3500, which is associated with Antwuan GREEN, Jr.. During an interview, as described below, GREEN, Jr. also confirmed that this was his telephone number. This phone number contacted RAY II seven times between the hours of 5:18 a.m. and 11:14 a.m. on November 25, 2019 (first kidnapping attempt). This same number was also contacted by AVILA's cellphone nine times on November 25, 2019 between the hours of 5:25 a.m. and 6:24 a.m. The cell phone download of AVILA's work cell phone has one text with this number. The contact is listed as "Twuan" and on November 25, 2019, there is a text from AVILA stating "I wanna let you know, I'm still helping y'all out with something. Just give me a little time cuz the money was coming from what we were supposed to get, so now I just gotta figure it out and get ya'll SOMETHING at least. I appreciate everything."

44.     On July 16, 2020, agents from Homeland Security Investigations located and conducted a consensual interview with GREEN, Jr. about the kidnapping attempts. GREEN, Jr. indicated that he was first contacted by RAY II telephonically and then ultimately met with RAY II and AVILA in person; AVILA explained that she wanted to kidnap VICTIM #1. GREEN, Jr. confirmed he was involved with the first kidnapping attempt and confirmed the involvement of RAY II. In a follow up interview on July 21, 2020, GREEN, Jr. acknowledged there were two other persons involved in the first attempt as well. GREEN, Jr. stated one of the other individuals involved in the first attempt was named Javon (last name unknown) and also went by the nickname "fatboy". The second individual involved was his brother Antonio GREEN. As part of the conspiracy, AVILA, RAY II, GREEN, Jr., Javon, and Antonio GREEN met and spent the night at a location rented by AVILA; according to GREEN, Jr., RAY II had the address of the meet-up and led them to the location.

14

45.     The evidence gathered to date reveals some, but not necessarily all, communications between RAY II and co-conspirators about the crimes under investigation. Cellular telephone data, and particularly location data can also be useful in establishing at least the presence of the Device at a particular location. Maps and other apps also often provide more specific evidence about places visited before, during and immediately after the commission of crimes than cell-site data. GREEN, Jr. also stated that he did not recruit Javon a/k/a "fatboy"; thus, it is possible that RAY II knows this individual and would have identifying information in the Device that would further the investigation. This inference is made based on the fact that RAY II initially reached out to GREEN, Jr. about participation via the Device.

46.     The evidence, including the cell phone activity, video recordings, and interviews, indicates that AVILA, WISE, RAY II, OUSLEY, MCCALLISTER, GREEN and others conspired to kidnap VICTIMS #1 and #2.

47.     The evidence further indicates that AVILA, RAY II and at least three other people were responsible for attempting to kidnap at least VICTIM #1 on November 25, 2019.

48.     The evidence indicates that OUSLEY and MCCALLISTER were responsible for attempting to kidnap VICTIM 1 and VICTIM 2 on December 4, 2019.

49.     Finally, there is evidence that AVILA, OUSLEY and MCCALLISTER conspired to impersonate federal immigration officers in making an arrest as part of the conspiracy to kidnap VICTIM1, who was known to AVILA to be in the country illegally and whom she believed could not contact the police because of that status.

50.     On July 15, 2020, agents from Homeland Security Investigations received federal arrest warrants in connection with a criminal complaint for AVILA, OUSLEY, WISE, RAY II, and MCCALLISTER for their involvement in this kidnapping conspiracy.

51.     On July 16, 2020, agents from Homeland Security Investigations arrested AVILA, OUSLEY, WISE, RAY II, and MCCALLISTER.

52.     The Device is currently in the lawful possession of Homeland Security Investigations. It came into Homeland Security Investigations possession when it was seized incident to RAY II's arrest on July 16, 2020; therefore, while Homeland Security Investigations might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

53.     The Device is currently in storage at 170 North High Street, Suite 206, Columbus, Ohio -43215. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Homeland Security Investigations.

## TECHNICAL TERMS

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

16

through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

55.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

56.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

17

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

     57.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

     a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

     b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

     c.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

18

evidence may depend on other information stored on the computer and the
application of knowledge about how a computer behaves. Therefore, contextual
information necessary to understand other evidence also falls within the scope of
the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who
used it, and when, sometimes it is necessary to establish that a particular thing is
not present on a storage medium.

58.     *Nature of examination.*  Based on the foregoing, and consistent with Rule
41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent
with the warrant. The examination may require authorities to employ techniques, including but
not limited to computer-assisted scans of the entire medium, that might expose many parts of the
device to human inspection in order to determine whether it is evidence described by the warrant.

59.     *Manner of execution.*  Because this warrant seeks only permission to examine a
device already in law enforcement's possession, the execution of this warrant does not involve
the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the
Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

60.     I submit that this affidavit supports probable cause for a search warrant
authorizing the examination of the Device described in Attachment A to seek the items described
in Attachment B.

19

Jeremy Copeland, Task Force Agent
Department of Homeland Security
Homeland Security Investigations, Columbus

Sworn to before me, and subscribed in my presence, this 28th day of July 2020, at Columbus, Ohio.

Chelsey M. Vascura
United States Magistrate Judge
Southern District of Ohio

20

## **ATTACHMENT A**

The property to be searched is an Apple iPhone 8+, red in color, seized on the person of Ellis Latrent RAY, II at the time of his arrest, hereinafter the "Device." The Device is currently located at 170 North High Street, Suite 206, Columbus, Ohio.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.  All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1201(c) and (d), 371 and 913 and involve Denia Idelca AVILA, Jessica WISE, Ellis LaTrent RAY, II, Michael OUSLEY, Jerry MCCALLISTER and others since November 22, 2019, including:

      a.  Antwuan GREEN JR.

      b.  "Fatboy"

      c.  Javon

      d.  Antonio GREEN

      e.  any financial information or transactions related to the receipt of payment for participation in the conspiracy and attempt, including receipt by cash or wire or other application, such as Cash App or Venmo, etc.

      f.  any information recording RAY's schedule or travel from November 22, 2019 to the present;

      g.  information about the planning or execution of efforts to kidnap VICTIMS #1 and #2

2.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2